RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0203p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 25-3209

RISHAD WILLIAMS, aka Rashad Williams,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:23-cr-00113-1—James R. Knepp II, District Judge.

Argued: March 18, 2026

Decided and Filed: July 24, 2026

Before: BUSH, READLER, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Ashley S. Alexander, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellant. Frank H. Spryszak, UNITED STATES ATTORNEY'S OFFICE, Toledo, Ohio, for Appellee. **ON BRIEF:** Ashley S. Alexander, Charles L. McCloud, WILLIAMS & CONNOLLY, LLP, Washington, D.C., Stephen F. Raiola, KIBLER FOWLER & CAVE LLP, Pittsburgh, Pennsylvania, for Appellant. Frank H. Spryszak, UNITED STATES ATTORNEY'S OFFICE, Toledo, Ohio, for Appellee.

───────────────

## OPINION

───────────────

READLER, Circuit Judge. Lacking a written plea agreement preserving any issues for appeal, Rishad Williams pleaded guilty to two counts of possessing a firearm as a felon. The district court sentenced Williams to 100 months' imprisonment based in part on a sentence

enhancement for possessing a firearm in connection with a felony offense. *See* U.S. Sent'g Guidelines Manual § 2K2.1(b)(6)(B) (U.S. Sent'g Comm'n 2024). Despite the nature of his plea, Williams now asks us to address a host of arguments, from violations of his Second, Fourth, and Sixth Amendment rights to the improper application of a sentence enhancement.

Because Williams pleaded guilty unconditionally, we do not reach his Second and Fourth Amendment arguments. As for his Sixth Amendment claim, we follow our usual practice of not deciding on direct appeal whether a defendant received ineffective assistance of counsel in district court. That leaves Williams's sentencing argument, for which ample evidence supports application of the enhancement. Accordingly, we affirm.

I.

Asia Amaya, Williams's girlfriend, told officers that Williams hit her in the face, grabbed her lawfully owned handgun, chambered a round, and threatened her with the weapon. Those allegations resulted in Williams's arrest. Following the arrest, Amaya texted Williams: "[I] ain't ask you to come in the house drunk af putting yo hand on me pregnant and all that dumb ass shit! All that drinking bring out another side of you that always put you in dumb ass predicaments!" R. 41-1, PageID 245.

Williams described these events differently. He initially claimed that he never saw a firearm during the argument with Amaya and in fact did not even know there was a gun in the house. After forensic testing revealed his DNA on the weapon, Williams revised his story: He was taking the gun out of Amaya's hands because she was threatening him with it. Nevertheless, officers took Williams into custody, and he was charged in state court with domestic violence and illegally possessing a firearm. Williams was subsequently released on bond.

In the meantime, federal prosecutors turned their eyes toward Williams. A federal grand jury indicted Williams for possessing a firearm following an earlier felony conviction (felonious assault) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). The indictment generated an arrest warrant for Williams. Officers executed the warrant after locating Williams at Amaya's home. Once the officers detained Williams, they placed him on the home's front porch while they conducted a protective sweep of the home. When the officers returned to the porch, Williams

asked for clothing. Believing he had Williams's consent to reenter the home, an officer went back upstairs to the primary bedroom to collect something for Williams to wear. There, he discovered more than shirts and pants; the officer found a stolen semi-automatic rifle with a 100-round drum magazine in plain sight.

With all of these events in mind, the government offered Williams a plea deal. In exchange for Williams pleading guilty to the original felon-in-possession count arising from his dispute with Amaya, the government would agree not to file a superseding indictment with a new felon-in-possession count based on the stolen rifle Williams was alleged to possess. Williams's attorney declined the offer. So the government re-indicted Williams on two counts of violating § 922(g)(1) and § 924(a)(8). Williams moved to suppress the rifle found in Amaya's bedroom, but the district court denied the motion. The district court likewise denied Williams's motion to dismiss the indictment on Second Amendment grounds.

At a pretrial hearing, the government noted that Williams had turned down its prior plea deal and indicated that it was no longer willing to negotiate a deal in which Williams pleaded guilty only to Count 1 (which, between the two counts, would generate the lower Sentencing Guidelines range because his possession of the handgun, unlike the later-discovered rifle, was not subject to the same Guidelines enhancements). The government then made impromptu calculations for the Guidelines range Williams would be facing for Count 2 compared to what he would have faced had he pleaded guilty to Count 1. This on-the-spot math suggested that Williams would be subject to a range of 77 to 96 months for Count 2, but only 27 to 33 months for Count 1. At this point, Williams interjected that he "wasn't informed of none of this." R. 61, PageID 442. And following the hearing, Williams sent a letter to the district court explaining that he "was misinformed by counsel concerning the agreement that was initially offered[.] [M]y counsel never made me aware of a 24 month [sic] plea." R. 31, PageID 142.

Williams ended up pleading guilty to both counts. But he did so, it bears emphasizing, without a negotiated plea agreement. Addressing that fact with Williams at his plea hearing, the district court remarked that Williams was "not waiving any of [his] appellate rights, other than just the fact that you end up testifying that you did what the Government said you did":

> [I]f the case went to trial and if you were convicted, you'd have the ability to take an appeal from your conviction. I think that's a little more difficult if you plead guilty because part of pleading guilty here today is you're going to admit that you did what the Government said you did, so that boxes you in a little bit. Now, there's no plea agreement here, so you're not waiving any of your appellate rights, other than just the fact that you end up testifying that you did what the Government said you did.

R. 55, PageID 346.

At sentencing, the government asked the district court to apply a sentence enhancement under Guidelines § 2K2.1(b)(6)(B) due to Williams's possession of a firearm in connection with a felony offense. *See* U.S. Sent'g Guidelines Manual § 2K2.1(b)(6)(B). (This section has subsequently been renumbered. *See* U.S. Sent'g Guidelines Manual § 2K2.1(b)(7)(B) (U.S. Sent'g Comm'n 2025). The parties, however, refer to it by its 2024 name because those provisions controlled at the time of sentencing, *see Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013), so we do as well.) The government sought the enhancement on the ground that Williams had committed felonious assault under Ohio law by pointing the handgun at Amaya while threatening her. Williams responded that he merely grabbed the gun to remove the weapon from Amaya's grasp. For support, he offered an affidavit from Amaya explaining that she pulled the gun on Williams, and that he simply removed it from her hands without threatening her. Amaya also appeared as a witness at Williams's sentencing hearing. Yet shortly after taking the stand, Amaya asked for a lawyer and then refused to testify.

Taking into account this evidence alongside the bodycam footage from the night of the incident, the district court determined that the enhancement applied. The result was a Guidelines range of 100 to 125 months. The district court imposed a sentence of 100 months' imprisonment.

Williams filed a timely notice of appeal. Before us, he raises four purported errors from his district court proceeding. Three are constitutional challenges tied to his guilty plea: one, that the § 922(g)(1) indictment violated the Second Amendment; two, that the officer's discovery of the rifle violated the Fourth Amendment; and three, that his counsel's representation fell short of the Sixth Amendment's effectiveness baseline because counsel failed to communicate the

government's initial plea deal to him. Lastly, Williams contends that the district court lacked evidence sufficient to justify application of the § 2K2.1(b)(6)(B) enhancement.

II.

Plea bargaining is a familiar practice in the federal courts. *Blackledge v. Allison*, 431 U.S. 63, 71 (1977) (calling plea bargaining an "important component[] of [our nation's] criminal justice system"); *see also A Better Way to Plea Bargain*, Vand. Univ. L. Sch. (June 23, 2025, at 10:11 CT), https://perma.cc/9297-VJYP ("More than 90% of convictions in the U.S. come through plea bargaining."). In its best form, plea bargaining affords parties to a criminal prosecution the freedom to work out mutually agreeable outcomes while bringing finality to the matter, leaving the court more room to address the many other matters swelling its docket. *See* Frank H. Easterbrook, *Plea Bargaining as Compromise*, 101 Yale L.J. 1969, 1975–76 (1992). That said, the practice has its critics, most notably due to the understandable concern over wrongful convictions tied to coercive tactics. *See, e.g.*, Stephanos Bibas, *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of* Alford *and Nolo Contendere Pleas*, 88 Corn. L. Rev. 1361, 1363–66 (2003); Stephen J. Schulhofer, *Plea Bargaining as Disaster*, 101 Yale L.J. 1979, 1980–91 (1992). Either way, plea bargaining remains a recognizable component of the criminal justice system, not only in the United States, but also in many other corners of the world too, from Malaysia to Malawi. *See* Zaiton Hamin, Mohd Bahrin Othman & Ahmad Ridhwan Abd Rani, *When Law and Practice Collide: The Implementation of the Plea-Bargaining Process in Malaysia*, 14 Asian J. Criminology 223, 226–29 (2019) (discussing the adoption of plea bargaining in Malaysia); Ruth Mputeni, *Chief Justice of Malawi Commends Progress of Plea Bargaining in Enhancing Access to Justice*, Malawi Judiciary (June 24, 2026), https://perma.cc/86G2-VDPP (addressing the introduction of plea bargaining to Malawian courts).

Like many aspects of American law, the plea bargaining process employs safeguards that aim to protect the parties to the process. Many are in place to honor a defendant's constitutional and statutory rights. *E.g.*, Fed. R. Crim. P. 11(b)(2) (requiring the district court to "address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises"). Others help ensure that the parties and the court alike

understand the agreement's reach. As explained next, today's case tests one of the latter precautions—the requirement that a defendant fairly notify the government and the court when he believes he is entering a conditional plea, rather than an unconditional one.

A. Turning to that issue, Williams's first two constitutional challenges to his guilty plea are beyond our reach. Recall that Williams pleaded guilty to both counts of the indictment without any sort of agreement. The usual rule is that when a defendant unconditionally pleads guilty, he generally "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *United States v. Abdulmutallab*, 739 F.3d 891, 904 (6th Cir. 2014) (quoting *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)). An unconditional plea thus amounts to a broad waiver to "all non-jurisdictional defects in the pre-plea proceedings" (save for concerns that the plea was not knowing and voluntary, including claims of ineffective assistance of counsel). *United States v. Bell*, 350 F.3d 534, 535 (6th Cir. 2003) (quoting *United States v. Herrera*, 265 F.3d 349, 351 (6th Cir. 2001)); *see Abdulmutallab*, 739 F.3d at 904; *see also Hunter v. United States*, 146 S. Ct. 1702, 1711 (2026) ("[A]n appeal waiver, like the rest of a plea agreement, must be knowing and voluntary to be valid and thus to be enforceable.").

Federal Rule of Criminal Procedure 11(a)(2), however, carves out a narrow exception. It permits a conditional guilty plea that reserves specific pretrial issues for appeal. Fed. R. Crim. P. 11(a)(2). So what does a Rule 11(a)(2) plea entail? It places the burden on the defendant to reserve the right to appeal specific pre-plea issues "in writing" and to obtain the government's and the district court's consent to those reservations. *See United States v. Schaffer*, 586 F.3d 414, 420 (6th Cir. 2009) (citing *United States v. Pickett*, 941 F.2d 411, 416 (6th Cir. 1991)).

A straightforward reading of Williams's plea hearing transcript demonstrates why the rule from *Abdulmutallab* controls here. For one, there was no written plea agreement, which Rule 11(a)(2) requires. For another, neither Williams, the district court, nor the government "specified" any "pretrial motion[s]" for which Williams was reserving his right to appeal. Fed. R. Crim. P. 11(a)(2). As in *Abdulmutallab*, in other words, we have a defendant who pleaded guilty unconditionally without any agreement and without affirmatively seeking to preserve any

pre-plea issues for appeal. *See* 739 F.3d at 904. Like *Abdulmutallab*, that unconditional plea waives Williams's pre-plea constitutional objections. *Id.*

Viewing these events in a different light, Williams emphasizes the district court's statement at his plea hearing that "there's no plea agreement here, so you're not waiving any of your appellate rights, other than just the fact that you end up testifying that you did what the Government said you did." R. 55, PageID 346. The statement, "you're not waiving any of your appellate rights," Williams says, turned his unconditional plea into a conditional one, preserving his right to appeal. And the government, he adds, consented to this preservation 20 pages later in the plea hearing transcript. When the district court asked, "are you satisfied with the thoroughness of the explanation of rights and the voluntary nature of the waiver of those rights, and the change of plea which I have obtained from Mr. Williams here today?" the government, Williams notes, replied, "Yes." *Id.* at PageID 356.

Rule 11(a)(2) stands in Williams's way. That Rule placed the burden on Williams to propose in writing specific pretrial issues to preserve for appeal and limited the district court's role to merely consenting to the proposed conditional plea. Nothing in the text of that rule envisions a separate mechanism for a conditional plea occurring where the district court leads that initiative. *Cf. Alzandani v. Hamtramck Pub. Schs.*, 176 F.4th 455, 467 (6th Cir. 2026) (observing that "judges should pause before crafting extratextual workarounds" to "intricate procedural mechanisms"). Our recent decision in *United States v. Johnson*, No. 25-5418, 2026 WL 228739 (6th Cir. Jan. 28, 2026), says as much. There, we held that a district court's use of similar language—namely, that the defendant had "not waived any appeal rights"—was insufficient to demonstrate that a plea was conditional. *Johnson*, 2026 WL 228739, at *3. There is no reason to treat materially similar language differently here.

Even if we ignored *Johnson*'s persuasive force, the district court's statement is seemingly best understood as an acknowledgment that, because there was no plea agreement in place, Williams could appeal his sentence, but not his conviction. That would explain why the district court warned Williams that by pleading guilty, he was testifying that he did what the government said he did. This conclusion is consistent with the reality that a guilty plea functions as a "break in the chain of events which has preceded it in the criminal process." *Tollett*, 411 U.S. at 267.

And it is why the district court advised Williams that pleading guilty would preclude him from relitigating whether the conduct charged in the indictment actually occurred. *See id.* Put another way, Williams admitted that he possessed two firearms illegally, which prevents him from now arguing that the government could not prove he possessed those firearms or that it was not illegal for him to possess them.

We likewise do not share Williams's expansive reading of the district court's use of the word "any" when referring to Williams's appellate rights. Setting aside the fact that this comment was not in writing and did not come from Williams, contrary to Rule 11(a)(2), the stray use of the word "any," standing alone, does not transform an unconditional plea into a conditional one (especially when the issues purportedly preserved for appeal were not mentioned contemporaneously with the statement). Rule 11(a)(2) required Williams to isolate "specified pretrial motions" at issue for appeal. Williams points to no case (and we have found none) where a defendant successfully met Rule 11(a)(2)'s specification requirement through such general language.

Nor do we agree with Williams that a separate statement made months later at his sentencing hearing cemented his plea as a conditional one. After announcing Williams's sentence, the district court told Williams that he had "the right to take an appeal from anything about this case." R. 51, PageID 320. According to Williams, that remark explains what the district court meant to convey months earlier at Williams's change of plea hearing. But the path to that conclusion runs into two roadblocks. The first is the statement's context. Immediately after saying the above, the district court qualified its words by indicating that Williams's right to appeal was limited to anything "that still remains about the case." *Id.* at PageID 321. What could that latter comment encompass? Very little, if Williams's guilty plea was unconditional. In that setting, his pre-plea motions no longer remained live issues in the case—the guilty plea extinguished those claims. *See Tollett*, 411 U.S. at 267. So all that the district court's statement does is take us back to the original question—whether Williams's plea was conditional in the first place.

The second obstacle is precedent. In our Circuit, a district court cannot revive a defendant's appellate rights at sentencing by erroneously stating that the defendant has preserved

certain issues for appeal. *See United States v. Fleming*, 239 F.3d 761, 764–65 (6th Cir. 2001); *cf. Hunter*, 146 S. Ct. at 1710 (explaining that in the plea agreement context, a "statement [that] was merely a momentary mistake . . . could not change . . . [the] agreement"). It follows that if Williams's original plea waived his pre-plea arguments, it does not matter what the district court said at sentencing (returning our focus once again to the statement at issue from his plea hearing).

Next, Williams suggests that the government acquiesced to his preservation of these issues for appeal by not engaging Williams on the matter in district court. As the foregoing discussion illustrates, however, the district court's statement was ambiguous at best, meaning the government's failure to interject for the purpose of clarifying the ambiguity does not equate to its consent to Williams's interpretation of that statement. *See, e.g.*, *United States v. Fitzgerald*, 820 F.3d 107, 112 (4th Cir. 2016) ("Silence or inaction by the government is not consent" to a conditional plea (citation modified)); *United States v. Sanfilippo*, 91 F.4th 1380, 1383 (11th Cir. 2024); *United States v. Cassidy*, 928 F.2d 1137, 1991 WL 39917, at *1 n.1 (9th Cir. 1991) (table) (mem.) (quoting *United States v. Yasak*, 884 F.2d 996, 999 (7th Cir. 1989)). *Contra United States v. Mastromatteo*, 538 F.3d 535, 541, 543 (6th Cir. 2008) (holding that the government was on notice of and consented to a conditional plea when the *defendant* expressly raised the particular issue he wanted to preserve for appeal). In fact, the Supreme Court recently clarified that failing to correct a district court's erroneous statement that a defendant may appeal does not forfeit the government's ability to make an appeal waiver argument if the defendant does later attempt to appeal. *Hunter*, 146 S. Ct. at 1710–11. Rather, "the proper time for the Government to assert its right to enforce an appeal waiver . . . is after a defendant has filed a notice of appeal." *Id.* at 1711.

Finally, Williams contends that the departure from Rule 11(a)(2)'s writing requirement was harmless. True, Rule 11(h) permits a "variance from the requirements of [Rule 11] . . . if it does not affect substantial rights." And deviations from Rule 11(a)(2)'s writing requirement can be harmless in the narrow instance where a defendant makes "it clear that he wished to preserve his right to appeal, the government acknowledged that he could appeal, and the court accepted that." *Mastromatteo*, 538 F.3d at 543. But the facts of the lead case on the point, *Mastromatteo*,

are far afield from today's. Mastromatteo "made it very clear that he intended to reserve his right to appeal the denial of [his] suppression motions" by stating on the record at his plea hearing that he "want[ed] to preserve his appeal rights in this matter . . . regarding the search and seizure issue." *Id.* at 541, 543. Here, on the other hand, Williams never said anything to suggest he wanted to preserve any issues for appeal; he instead points to the district court's statement at the plea hearing. The district court's statement, however, sheds no light on what Williams "intended" or "wished" for with respect to reserving his right to appeal. *Id.* at 543; *cf. Hunter*, 146 S. Ct. at 1710 ("[I]t is the parties' intent that matters, and their non-response response to the judge's representation falls far short of showing that they agreed to alter a conflicting term."). Because Rule 11 places the burden on Williams to carve out issues for appeal when pleading guilty, Williams was required to do more than rely on a one-off comment by the district court. Saying nothing understandably did not "ma[k]e it very clear that [Williams] intended to reserve his right to appeal." *Mastromatteo*, 538 F.3d at 543.

B. Williams's Sixth Amendment ineffective assistance of counsel claim similarly is not suited for review today, albeit for a different reason. Williams asserts that his counsel's performance fell below Sixth Amendment minima because counsel did not inform Williams of a plea offer made by the government. We agree with Williams that the Sixth Amendment right to effective counsel extends to plea negotiations, where the normal *Strickland v. Washington*, 466 U.S. 668 (1984), two-part analysis applies. *See Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985). Equally true, failing to communicate a plea offer to a client is deficient performance under the first *Strickland* prong. *See Missouri v. Frye*, 566 U.S. 134, 145 (2012). So Williams's claim that his lawyer failed to share the government's plea offer with him—if true—is troubling.

That said, the general rule is that ineffective assistance claims are not cognizable on direct appeal. *See Massaro v. United States*, 538 U.S. 500, 504–05 (2003); *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012) (quoting *United States v. Gunter*, 620 F.3d 642, 643 n.1 (6th Cir. 2010)). This practice follows from the presumption that the record on direct appeal is typically incomplete without an evidentiary hearing, which would allow the defendant, trial counsel, or any other witnesses to testify on the matter. *See Sypher*, 684 F.3d at 626 (citing *United States v. Walden*, 625 F.3d 961, 967 (6th Cir. 2010)). Perverse incentives would flow

from a contrary rule, as this case demonstrates. After all, any defendant who pleads guilty in a case where an offer was made (even if he knowingly rejected the prior deal) could claim on direct appeal that his lawyer did not communicate the offer. And so long as his lawyer had not anticipated that argument and expressly stated something to the contrary on the record before the district court, the defendant seemingly would have an uncontestable ineffectiveness claim on appeal. Thus, we leave this issue for collateral review.

Williams is correct to note that we employ an exception to this general practice for situations in which "the parties have adequately developed the record." *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012) (citing *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995); *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990)). But that does not describe Williams's case. His only evidence on the matter appears to be his own assertion that he was never notified of the plea offer. As in *Ferguson*, the "record is devoid of information regarding the discussions [Williams] had with his counsel regarding the plea agreement" outside of Williams's own arguments. *Id.* at 763. Williams's trial counsel never testified on this topic, and the district court did not inquire into the matter outside of asking Williams at his change of plea hearing if he was satisfied with the representation he had received. (Williams answered "yes.") As the record thus consists of merely "unsubstantiated allegations without affidavits from defense counsel or [a defendant] to buttress his arguments," it is not adequately developed. *United States v. McCarty*, 628 F.3d 284, 296 (6th Cir. 2010).

None of Williams's cited cases say otherwise. True, in *United States v. Angel*, 355 F.3d 462 (6th Cir. 2004), we did address an ineffectiveness claim on direct appeal. But we did so because the claim turned entirely on a question of law: whether trial counsel's undisputed choice to include a juror based on her race violated the Equal Protection Clause. *See Angel*, 355 F.3d at 470–72. Other cases fall along similar question of law lines. *See, e.g.*, *United States v. Watkins*, 509 F.3d 277, 283 (6th Cir. 2007) (reviewing claim where the merits of a different argument made the claim moot); *United States v. Blackstock*, 145 F.3d 1333, 1998 WL 152926, at *1–2 (6th Cir. 1998) (table) (per curiam) (reviewing claim where the district court made a legal error calculating the Guidelines range); *United States v. Hibbard*, 999 F.2d 541, 1993 WL 262001, at *1–2 (6th Cir. 1993) (table) (per curiam) (reviewing claim where the alleged ineffectiveness was

harmless).  Unlike the defendants in those cases, Williams raises fact-bound questions involving attorney-client communications.  All told, we believe it best to leave any ineffective assistance claim for development on collateral review.

### III.

That leaves Williams's argument that the district court erred post-plea in applying the § 2K2.1(b)(6)(B) sentence enhancement.  Section 2K2.1(b)(6)(B) authorizes a four-offense-level increase if the district court finds by a preponderance of the evidence that the defendant "used or possessed any firearm or ammunition in connection with another felony offense." *United States v. Shanklin*, 924 F.3d 905, 919 (6th Cir. 2019) (quoting U.S. Sent'g Guidelines Manual § 2K2.1(b)(6)(B) (U.S. Sent'g Comm'n 2018)).  In the specific context of the § 2K2.1(b)(6)(B) enhancement, we review the district court's legal conclusions about whether the enhancement applies with "due deference." *Id.* (quoting *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014)).  And we review its factual findings for clear error.  *Id.* (quoting *Seymour*, 739 F.3d at 929).  Here, the district court, having reviewed the police report and body camera footage, made factual findings that Williams used a firearm in connection with his felonious assault of Amaya.  Those findings were not clearly erroneous.

Consider the underlying state law offense the government alleged Williams committed.  Under Ohio law, felonious assault includes "[c]aus[ing] or attempt[ing] to cause physical harm to another . . . by means of a deadly weapon."  Ohio Rev. Code Ann. § 2903.11(A)(2).  The government therefore had to prove only that Williams pointed the gun at Amaya and threatened her in a way that indicated he would use the weapon. *See State v. Green*, 569 N.E.2d 1038, 1041 (Ohio 1991).  The district court found that Williams had done so.  As the record evidence revealed, immediately after officers removed Williams from Amaya's home, Amaya told the officers that Williams was "physically hitting [her] and just threatening to shoot [her] with [her] gun."  R. 41-2, at 0:23–0:30.  She also stated that Williams even went so far as to chamber a round.

Other facts corroborate Amaya's statements.  First, officers found a round on the floor near the gun, evidence consistent with someone chambering a round.  Second, Williams's DNA

was the major contributor of DNA found on the firearm, suggesting he had held it. Third, Amaya had bruising on her face, which the police report stated was consistent with her claim that Williams had hit her. And fourth, Amaya sent texts to Williams after the incident in which she accused him of hitting her, which Williams never denied. All told, the district court had enough evidence before it to apply the enhancement.

Williams responds that it was clearly erroneous for the district court to rely on Amaya's original statement to the officers, which both was captured by body camera footage and incriminated Williams, when she later clarified that statement and her allegation against Williams. Specifically, Amaya submitted an affidavit in which she indicated (unlike in her initial statement) that she pulled the gun on Williams during their argument and that he merely removed the gun from her hands, never chambered a round, and did not hit her.

We agree with Williams that when the district court at sentencing relies on hearsay statements like the dueling statements made by Amaya, there must be some "minimal indicium of reliability." *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019) (quoting *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992)). But, as the word "minimal" suggests, this is a "relatively low hurdle." *Id.* (quoting *United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007)). So if, as here, the district court finds a prior statement more reliable than a subsequent one, we will uphold that conclusion unless we deem it clearly erroneous. *See id.* (citing *United States v. Gibson*, 985 F.2d 860, 864 (6th Cir. 1993)).

Despite Amaya's subsequent affidavit, the district court found that Amaya's original statements proved by a preponderance of the evidence that Williams had threatened her with the gun. That conclusion is understandable, and at the very least far from clear error. Amaya's affidavit was inconsistent with the text messages she sent Williams accusing him of hitting her, and inconsistent with the round the officers discovered, which suggested someone had chambered a round in the gun. What is more, the district court recognized that Amaya had an incentive to retract her prior statements. Williams is the father of her two children, and it is fair to surmise that her life is harder the longer Williams is in prison. As for Williams, even his description of the night at issue shifted. Originally, he told officers that he never saw a firearm during the argument and did not even know there was a gun in the house. He adopted a much

different position—namely, that he was taking the gun out of Amaya's hands—once his DNA was found on the weapon. In the end, there are a host of reasons buttressing the district court's assessment that Amaya's original statement carried greater indicia of reliability. For that reason and others, the district court did not err in applying the § 2K2.1(b)(6)(B) sentence enhancement.

\* \* \* \* \*

We affirm.